IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEPHEN B. RUDOLPH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 09 C 428 |
| v. ) | |
| ) | Honorable Charles R. Norgle |
| INTERNATIONAL BUSINESS ) | |
| MACHINES CORPORATION, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

CHARLES R. NORGLE, District Judge

Before the Court is Defendant International Business Machines Corporation's ("IBM") Rule 12(c) motion for judgment on the pleadings. For the following reasons, IBM's motion is granted.

## I. BACKGROUND[1]

Plaintiff Stephen Rudolph ("Rudolph") worked as a senior enterprise systems sales representative for IBM from 1997 to 1999 and sold Tivoli-brand software for the company. Since 2000, Rudolph continues to work for IBM, but in a different capacity. On January 22, 2009, Rudolph filed a four-count complaint (the "Complaint") against IBM alleging that IBM breached the terms of Rudolph's 1999 compensation plan. The Complaint includes two breach of contract claims and two claims pursuant to the Illinois Wage Payment and Collection Act, 820 ILL. COMP. STAT. 115/1 et seq. (the "Wage Act").

**A. Rudolph's 1999 Compensation Plan**

---

[1] The following facts are taken from plaintiff's Complaint and the exhibits attached to the Complaint.

On May 27, 1999, Rudolph entered into an agreement with IBM that set forth the terms of his compensation for the 1999 sales year (the "1999 Compensation Plan" or the "Plan"). The 1999 Compensation Plan provided Rudolph a base salary of $69,600 and entitled him to an incentive bonus if he achieved his sales quota of $2.4 million. The incentive bonus was subject to certain "accelerators," which allowed Rudolph to increase the size of the bonus exponentially, depending on the amount by which he exceeded his sales quota.

Importantly, under the terms of the Plan, IBM sales management "reserve[d] the right to change a Tivoli Sales Employee's quota, sales objective(s), compensation plan and/or territory/account assignments for any reason (including, but not limited to territory/account reassignments or transfers, promotions/expanded responsibilities, organizational changes, separations, leaves of absence, etc.)," and the Plan stated that "[s]uch changes may have a resulting impact on that employee's compensation." Compl., Ex. 2, at 9.

More specifically, the Plan provided that:

THE TIVOLI 1999 COMPENSATION PLAN, INCLUDING THESE SALES POLICIES, TERRITORY ASSIGNMENTS, QUOTAS, AND INDIVIDUAL COMPENSATION PLANS CAN BE MODIFIED OR TERMINATED AT ANY TIME FOR ANY REASON – ON A PROSPECTIVE OR RETROACTIVE BASIS – BY THE VICE PRESIDENT OF SALES OPERATIONS OR THE SENIOR VICE PRESIDENT OF SALES. IN SUCH EVENT, WRITTEN NOTIFICATION WILL BE PROVIDED TO THE AFFECTED INDIVIDUALS.

Id. at 2 (capitalization in original).

### B. IBM's Termination of the 1999 Compensation Plan

On August 31, 1999, IBM informed Rudolph that the company was terminating the 1999 Compensation Plan effective immediately. At that time, Rudolph was already well over his $2.4 million sales quota for the year. IBM also told Rudolph that his yearly sales quota would not be "pro-rated" as it had been the previous year when IBM also prematurely terminated Rudolph's

compensation plan. Rudolph's Complaint asserts that IBM's failure to pro-rate his sales goal following its August 31, 1999 termination of the 1999 Compensation Plan violated the terms of the Plan and the Wage Act and cost him at least $255,000 with respect to his incentive bonus.

## C. Compensation for Rudolph's State Farm Software Sale

Rudolph's Complaint also alleges that Rudolph was not properly compensated for the software sale he made to State Farm Automobile Insurance Company ("State Farm") in the first half of 1999. Under the 1999 Compensation Plan, Rudolph's "credit" for a software sale was calculated by multiplying the "monthly licensing charge" ("MLC") - the fee IBM charged the client to use its software - by 48. If IBM waived the MLC for the client, however, Rudolph's "credit" for the sale was to be "calculated by multiplying the MLC by 48, less the number of months IBM waived the MLC . . . ." Compl. ¶ 35(e).

With respect to the State Farm sale, IBM agreed to waive the MLC for the software for eighteen months. Accordingly, IBM credited Rudolph for the sale at a rate of MLC times 30. Rudolph contends though that sometime after the signing of the Plan, IBM agreed to add a provision to the Plan creating an "exception process" for sales accompanied by MLC waivers if those offers were made prior to May 25, 1999. Rudolph further alleges that IBM told Rudolph it was "likely" the State Farm sale would qualify for the exception and be calculated at the MLC times 48 rate. Id. ¶ 36(a). According to Rudolph, IBM's failure to properly credit him for the State Farm sale violated the terms of the Plan and the Wage Act and damaged him in the amount of $193,000.

## D. IBM's Motion for Judgment on the Pleadings

On June 1, 2009, IBM filed a Rule 12(c) motion for judgment on the pleadings (the "Motion"), contending that the 1999 Compensation Plan is not an enforceable employment

3

contract and Rudolph therefore has no right to additional commissions. The motion is now fully briefed and before the Court.

## DISCUSSION

### A. Standard of Review

Under FED. R. CIV. P. 12(c), a party can move for judgment on the pleadings once the parties have filed the complaint and answer. N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 452 (7th Cir. 1998). A motion for judgment on the pleadings is reviewed under the same standard as a Rule 12(b)(6) motion to dismiss. Pisciotta v. Old Nat'l Bancorp, 499 F.3d 629, 633 (7th Cir. 2007). Accordingly, in order to defeat a Rule 12(c) motion for judgment on the pleadings, a plaintiff must demonstrate that his or her complaint provides notice of plaintiff's claims and the grounds upon which they rest, and must contain sufficient allegations, based on more than speculation, to state a claim for relief that is plausible on its face. St. John's United Church of Christ v. City of Chi., 502 F.3d 616, 625 (7th Cir. 2007) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Bell Atl. Corp., 550 U.S. at 555 (citation omitted) ("Factual allegations must be enough to raise a right to relief above the speculative level."). The Court, however, must accept as true the factual allegations contained in the complaint and draw all reasonable inferences in favor of the non-moving party. St. John's, 502 F.3d at 625.

A court may rule on a Rule 12(c) motion for judgment on the pleadings based on a review of the pleadings alone. N. Ind. Gun, 163 F.3d at 452. The pleadings include the compliant, the answer, and any written instruments attached as exhibits, such as affidavits, letters, contracts, and loan documentation. Id. at 452-53. In ruling on a motion for judgment on the pleadings, "the district court may take into consideration documents incorporated by

reference to the pleadings" and "may also take judicial notice of matters of public record." U.S. v. Wood, 925 F.2d 1580, 1582 (7th Cir. 1991).

**B. The Enforceability of the 1999 Compensation Plan**

For Rudolph to recover on his breach of contract claims he must first establish that the 1999 Compensation Plan is an enforceable employment contract. Rakos v. Skytel Corp., 954 F.Supp. 1234, 1237 (N.D. Ill. 1996). Under Illinois law, "[i]n order to find that a document is an employment contract, a three-part test must be met: (1) the document must contain language clear enough that an employee would reasonably believe that an offer had been made; (2) the document must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer; and (3) the employee accepts the offer by commencing or continuing work." Id. (citing Duldulao v. Saint Mary of Nazareth Hosp. Ctr., 505 N.E.2d 314, 318 (Ill. 1987)). "The three-part test is evaluated under an objective standard, so the employee's subjective beliefs are not considered." Maxwell v. Vertical Networks, Inc., No. 03 C 5175, 2005 WL 950634, at *5 (N.D. Ill. March 18, 2005) (citations omitted).

Courts have consistently held as a matter of law that a compensation plan does not create an enforceable contract if the language of the plan explicitly provides an employer the right to modify or terminate the plan at any time. See Rakos, 954 F.Supp at 1237 (concluding that a compensation plan did not create an enforceable contract as a matter of law because "[d]efendant clearly retained the right to modify or cancel the Plan at any time without prior notice"); see also Maxwell, 2005 WL 950634, at *6 ("The disclaimers contained in the 2001 [compensation] Plan effectively bar Plaintiff's breach of contract claims because, where an employer retains the right to make unilateral modifications to the plan at any time, there can be no reasonable belief that an offer was made with regard to the incentive compensation."); Schultz v. Sallie Mae, Inc., No. 99

5

C 3613, 1999 WL 988772, at *3 (N.D. Ill. Oct. 28, 1999) (dismissing plaintiff's breach of contract claim because plaintiff could not reasonably believe she had enforceable rights in an incentive plan that allowed defendant to modify or terminate the award calculation at any time, for any reason); Grottkau v. Sky Climber, Inc., No. 93 C 6277, 1995 WL 32611, at *21 (N.D. Ill. Jan. 26, 1995) (holding that an incentive plan did not create an enforceable contract right as a matter of law where the plan expressly stated that defendant "retained the right to modify or cancel the incentive program at any time"); Moore v. Ill. Bell Telephone Co., 508 N.E.2d 519, 521 (Ill. App. Ct. 1987) (holding that an incentive plan did not create any enforceable contract rights because the language of plan explicitly warned that the plan was not assurance of compensation). As the Rakos court explained, "[s]uch a statement is an effective disclaimer to negate any possible promissory intent." 954 F.Supp. at 1237 (citation omitted).

In the present case, Rudolph's 1999 Compensation Plan contains language that is almost identical to the language of the compensation plans in Rakos, Maxwell, Schultz, Grottkau, and Moore. For example, the 1999 Compensation Plan states in all caps that, "INDIVIDUAL COMPENSATION PLANS CAN BE MODIFIED OR TERMINATED AT ANY TIME FOR ANY REASON. . . ." Compl., Ex. 2 at 2. In addition, the 1999 Compensation Plan expressly notes that "Tivoli sales management reserves the right to change a Tivoli Sales Employee's quota, sales objective(s), compensation plan and/or territory/account assignments for any reason . . . ." Id. at 9. Given that Rudolph's 1999 Compensation Plan allowed IBM to unilaterally modify or terminate the Plan at any time, Rudolph could not have reasonably believed that IBM made an offer with respect to incentive compensation. As a result, the 1999 Compensation Plan cannot be considered an enforceable employment contract and Rudolph's breach of contract claims must therefore be dismissed.

Rudolph attempts to salvage his breach of contract claims by arguing that IBM's allegedly improper calculation of Rudolph's commissions breached IBM's duty of good faith and fair dealing. See Rudolph Resp. at 5-7. What Rudolph fails to acknowledge, however, is that the duty of good faith "is not an independent source of duties for the parties to the contract." Guardino v. Chrysler Corp., 691 N.E.2d 787, 793 (Ill. App. Ct. 1998) (citations omitted). Rather, "'good faith' in contract law is a gap-filling approach designed for an issue that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." L.A.P.D., Inc. v. Gen'l Elec., 132 F.3d 402, 404 (7th Cir. 1997) (quotations and citation omitted). Accordingly, "[l]itigants may not seek to litigate issues of 'good faith' in lieu of abiding by explicit provisions of contracts." Id. As the L.A.P.D. court explained, if a contract allows a party to modify or terminate the contract without cause, "use of that power is not contingent on satisfying a court that the decision was an exercise of 'good faith and fair dealing.' One party need not reveal to the other the criteria that will lead it to terminate the relation, when the contract allows *any* reason (or none) to suffice." Id.

Here, Rudolph's 1999 Compensation Plan, as noted above, expressly allowed IBM to terminate or modify the Plan at any time, for any reason. Thus, under L.A.P.D, IBM did not have to exercise its power to terminate the Plan in good faith. Therefore, with respect to Rudolph's breach of contract claims, he cannot use the duty of good faith to avoid the dispositive impact of the explicit disclaimers included in the 1999 Compensation Plan.

## C. Rudolph's Wage Act Claims

Rudolph next contends that even if the Court finds the 1999 Compensation Plan unenforceable, he can still maintain an actionable claim under the Wage Act because the Act permits an employee to recover wages pursuant to an "employment contract *or agreement.*" 820

ILL. COMP. STAT. 115/2 (emphasis added). Rudolph claims that, notwithstanding the unenforceability of the 1999 Compensation Plan, he should be able to recover for the commissions related to the State Farm software sale because "IBM agreed it would create an 'exception process' to review special transactions such as the State Farm sale . . . ." Rudolph Resp. at 9. Thus, according to Rudolph, because he is seeking to recover his commissions based on this "agreement" with IBM, and not an employment contract, he can pursue his Wage Act claims.

Rudolph's argument is unavailing. Under Illinois law, to recover under the Wage Act pursuant to an employment agreement a plaintiff must "plead facts showing mutual assent to terms that support the recovery." Landers-Scelfo v. Corporate Office Sys., Inc., 827 N.E.2d 1051, 1059 (Ill. App. Ct. 2005). The allegations contained in Rudolph's own complaint, however, belie his contention that IBM assented to pay Rudolph at the MLC times 48 rate for the State Farm software sale. Rudolph's Complaint alleges in pertinent part that, "IBM informed Rudolph that since the offer to State Farm was made in December 2008 and since the customer was important to IBM, the State Farm sale would *likely* qualify for the exception and the sale would calculated at 48 times the MLC." Compl. ¶ 36(a) (emphasis added). Furthermore, Rudolph states that on July 15, 1999 he "sent an e-mail to senior management at IBM explaining why the State Farm sale should be credited at a multiple of 48x," but "[d]espite dozens of follow-up e-mails and telephone calls to senior IBM sales management over the next several months, Rudolph received no formal response from IBM on the request that the State Farm sale be credited at a multiple of 48x." Id. ¶¶ 42-3.

Thus, according to Rudolph's own complaint, IBM never assented to credit Rudolph at the higher rate, but rather only suggested that it would consider awarding the higher rate. Such

8

indefinite remarks are not sufficient to obligate IBM to pay increased commissions. See Cresswell v. Bausch & Lomb, Inc., No. 85 C 5822, 1986 WL 13528, at *5 (N.D. Ill. Nov. 21, 1986) (holding that an employer's indefinite remarks concerning an employee's bonus did not obligate the employer to pay the bonus where the employer retained the discretion to award the bonus). IBM's lack of response to Rudolph's email concerning the State Farm sale further demonstrates that IBM never agreed to credit Rudolph at the higher rate. Therefore because Rudolph has alleged facts that preclude relief with respect to his Wage Act claims, Rudolph has effectively pleaded himself out of court. See Benders v. Bellows & Bellows, 515 F.3d 757, 767 (7th Cir. 2008) (citation omitted) ("[A] plaintiff can plead herself out of court by alleging facts that show she is not entitled to a judgment."); see also Maxwell, 2005 WL 950634, at *10 (stating that it would be appropriate to dismiss plaintiff's Wage Act claim because the incentive plans at issue "did not contain binding offers and Plaintiff cannot enforce the incentive commissions described in those plans"); Rakos, 954 F.Supp at 1240 ("Since plaintiff is not due any wages from defendant, he cannot make a claim under the [Wage] Act.").

### III. CONCLUSION

For the foregoing reasons, IBM's motion for judgment on the pleadings is granted.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATED: August 21, 2009